[Cite as *State v. Dotson*, 2019-Ohio-2393.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee/<br>Cross-Appellant, | : | |
| | : | **CASE NO. 2017-T-0103** |
| - vs - | : | |
| | : | |
| BRYAN MITCHELL DOTSON, | : | |
| Defendant-Appellant/<br>Cross-Appellee. | : | |
| | : | |

Criminal Appeal from the Trumbull County Court of Common Pleas.
Case No. 2016 CR 00368.

Judgment: Affirmed in part and reversed in part; remanded.


*Dennis Watkins*, Trumbull County Prosecutor, and *Ashleigh Musick*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481-1092 (For Plaintiff-Appellee/Cross-Appellant).

*Michael A. Partlow*, 112 South Water Street, Suite C, Kent, OH 44240 (For Defendant-Appellant/Cross-Appellee).


TIMOTHY P. CANNON, J.

{¶1} The Trumbull County Court of Common Pleas issued an entry on October 6, 2017, sentencing Bryan Mitchell Dotson to a term of 60 months in prison following a jury trial. Dotson filed an appeal from this entry, and the state of Ohio filed a cross-appeal. The issues on appeal are the sufficiency and weight of the evidence, as well as the merger

of seven counts of grand theft of a motor vehicle. The judgment is affirmed in part and reversed in part.

{¶2} The Trumbull County Grand Jury returned a nine-count indictment against appellant on August 17, 2016, charging him with seven counts of Grand Theft of a Motor Vehicle, fourth-degree felonies in violation of R.C. 2913.02(A)(1) & (B)(5) (Counts 1-7), and two counts of Breaking and Entering, fifth-degree felonies in violation of R.C. 2911.13(A) & (C) (Counts 8-9). The indictment was later amended to reflect that Counts 6 and 7 are Attempted Grand Theft of a Motor Vehicle, fifth-degree felonies, in violation of R.C. 2913.02(A)(1) & (B)(5).

{¶3} This case emanates from a breaking and entering and theft that occurred in March 2014 at Johnny K's Powersports in Niles, Ohio. Johnny K's is owned by John Kalogeras. The business sells ATVs, snowmobiles, side-by-side off-roading vehicles, motorcycles, jet skis, and the like. The business had recently expanded into the building next door, previously owned by Pace Pontiac ("Pace Building"). The Pace Building was undergoing renovations and used for storing vehicles; it was not yet open to the public.

{¶4} In the early morning of March 12, 2014, sometime between 4:30 and 5:30 a.m., Mr. Kalogeras received a text message from the owner of a business located across the street from Johnny K's, informing him that the glass door of the Pace Building was shattered and that a red side-by-side vehicle was in the roadway. Officers from the Niles City Police Department first responded to Johnny K's at 5:20 a.m. Mr. Kalogeras arrived at the Pace Building and met with the officers; he confirmed the side-by-side vehicle on the roadway belonged to his business. He also confirmed that five vehicles were missing from the building—two street motorcycles, one ATV with a plow, and two side-by-side

2

vehicles—and two other motorcycles had been damaged in an apparent effort to "hotwire" them.

{¶5} Around 7:30 a.m., Detective Jim Robbins reported to Johnny K's. He collected a coffee cup that he was told did not belong to Mr. Kalogeras or his employees and sent it for DNA testing. A few months later, CODIS (the Combined DNA Index System for incarcerated individuals) registered a presumptive match to the DNA found on the coffee cup: Jonathan Brown.

{¶6} Larry Skaggs, a trooper and investigator with the Ohio State Highway Patrol, was currently handling the case. When Trooper Skaggs received the DNA information, he interviewed Brown, who had been arrested on other charges, at the Girard Police Department. Brown agreed to cooperate with the investigation. He provided Trooper Skaggs with information about the stolen vehicles that was consistent with the description received from Johnny K's.

{¶7} Brown was indicted on charges related to the break-in. Pursuant to a plea agreement, he pled guilty to an amended indictment of four counts of Grand Theft of a Motor Vehicle and one count of Breaking and Entering. Brown was sentenced to 12 months in prison concurrent with the remainder of a sentence he was serving on an unrelated conviction.

{¶8} At appellant's trial, Brown testified he has known appellant since 2005 or 2006. They fell out of touch for a period of time, and they began spending time together again in January 2014. Brown testified that he and appellant sometimes spent time at the Niles residence of Stephanie Collins, with whom appellant was romantically involved.

3

{¶9} Stephanie was also interviewed by Trooper Skaggs and provided a written statement, after consulting with a lawyer, in which she provided information that was consistent with other information received during the investigation. Stephanie was not charged in connection with this case.

{¶10} Brown testified it was appellant's idea to break into Johnny K's because "it was an easy place to get." A day or two prior to the break-in, Brown went to Johnny K's to see if there was anything there that could be stolen. He entered the Pace Building through an open door, although he knew the shop was under construction and not open for business. Brown walked around the Pace Building until he was told by someone that the area was closed. Before he left, Brown was able to take keys from some of the vehicles and later gave them to appellant. Brown also admitted he left a coffee cup at Johnny K's on that day. Mr. Kalogeras corroborated that a day or two prior to the break-in, he noticed an individual in the Pace Building who immediately left when confronted.

{¶11} A couple days later, on March 11, 2014, Brown and two other men were at Fox's Auto with appellant, working on vehicles. Appellant was employed at Fox's Auto, and Brown worked there from time to time. A metal flake became lodged in appellant's eye while he was working on a vehicle.

{¶12} Brown testified that one of the men in the shop drove appellant to a hospital in Austintown, Ohio, and that he followed in his own car with Dan Gilliland. They arrived at the hospital around 6:00 p.m. and waited in the waiting room for many hours. Brown testified that he watched medical staff attempt to remove the metal flake with a mechanical device, but they were unsuccessful. Brown stated they all left the hospital

4

sometime after midnight on March 12, 2014, and returned to Fox's Auto. Mr. Gilliland rode with Brown, and someone else drove appellant.

{¶13} Brown testified that Quinton Grundy (also known as "Q"), a friend of appellant, also arrived at Fox's Auto. Brown stated that, after the other men left the shop, he, Grundy, and appellant decided to try and steal the vehicles from Johnny K's with the keys Brown had taken from the Pace Building. The trio left the shop and went to Stephanie's house.

{¶14} Stephanie testified, however, that she had picked up appellant from Fox's Auto around 10:30 p.m. and drove him to the hospital with Grundy. The three of them arrived around 11:00 p.m. Brown was also at the hospital, and appellant's mother was there for a short time. Stephanie stated they did not have to wait long for assistance. She watched the medical staff unsuccessfully attempt to remove the metal flake from appellant's eye with a mechanical device; they "had to patch him up and * * * he was supposed to have surgery done for it." Stephanie testified they were at the hospital for approximately two hours, then she took appellant and Grundy back to Fox's Auto. Candace Lightner, appellant's ex-girlfriend and mother of his child, was at Fox's Auto, and she was going to take appellant to the home they shared. However, not long after, around 1:00 or 2:00 a.m., appellant, Grundy, and Brown arrived at Stephanie's house.

{¶15} At Stephanie's residence, the three men discussed their plan one more time. Brown testified that Stephanie was in the room during the discussion, but she was not involved with the planning or with the break-in. Stephanie testified that she heard the men discuss that Brown had found a key in an ignition at Johnny K's and that they were going to go look around the building and see what was there.

5

{¶16} Brown testified that the men retrieved pry bars and tools from appellant's vehicle and then left on foot towards Johnny K's, which was not far from Stephanie's house. Stephanie stated she fell asleep after they left and does not remember them returning to her house.

{¶17} Brown testified they walked for about 20 minutes through backyards, a creek, and up a hill to get to Johnny K's. They observed the building from across a side street and then walked to a nearby vacant house and garage to come up with the next part of the plan. Appellant and Grundy crossed the street and checked the door to Johnny K's, then they all waited approximately 20 minutes in case a silent alarm had been tripped. The three men then approached the Pace Building together, and appellant and Grundy began to pry at the side door. The glass window fell out of the door and shattered on the ground. They unlocked the door and entered the building.

{¶18} They were able to match the stolen keys to an ATV with a plow and two side-by-side vehicles. Appellant and Grundy initially left the building with "hotwired" motorcycles, and Brown took a side-by-side vehicle that broke down on the side of the road. Appellant returned and left with the ATV; he picked up Brown. Grundy returned and left with a side-by-side vehicle. The vehicles were driven back to Stephanie's house. Brown testified that "[t]hen we got dropped back off across the street and went in for the next one." He did not state who dropped them off, nor was he asked. The trio unsuccessfully attempted to "hotwire" two more motorcycles, damaging them in the process. Brown took another side-by-side vehicle, and they all returned to Stephanie's house. The five vehicles were parked along the side of the house, where appellant

instructed the group to conceal them with tarps. Brown stated all this activity took a couple of hours.

{¶19} Stephanie testified she went to work the next morning, unaware of the stolen vehicles at her house. Her mother called her at work, and as a result, Stephanie called appellant and demanded he remove "the stuff" from her backyard. Brown testified that appellant instructed him to return to Stephanie's house to check the tarps and watch the vehicles because some of the neighbors had become suspicious and were complaining.

{¶20} When Stephanie arrived home around 6:00 p.m., Brown was still there. She did not go near the tarps that were still in her backyard. Appellant and Grundy arrived later with a small moving truck. As they were removing the vehicles from her property, Stephanie noticed two motorcycles, two utility vehicles, and an ATV with a plow. She stated they took the vehicles to Fox's Auto in multiple trips, and she followed them in her car on the last trip. Stephanie also testified that appellant told her he had initially offered Brown $1,500.00 for the job, but that he was only going to give him $300.00.

{¶21} Brown testified that the first vehicle transported from Stephanie's to Fox's Auto was the side-by-side he successfully took from Johnny K's. Brown stated he was supposed to receive $3,000.00 for the vehicle, but the owner of Fox's Auto only left him $300.00, so he left the shop before the side-by-side was even unloaded. Brown stated he was unaware what happened to the rest of the vehicles: "[It] was a dead deal after that point. Basically, I got burned on it so I didn't give a crap about it."

{¶22} Brown later agreed to wear a wire that recorded audio and video during a conversation with appellant. The conversation took place on August 14, 2014, at the

7

home appellant shared with Candace and their child. The audio is largely unintelligible. Brown testified, however, that he had inquired whether appellant was still in possession of any of the vehicles, and appellant had stated the owner of Fox's Auto was still in possession of the ATV with a plow. Appellant also told Brown that he heard Grundy had been talking about their involvement with the break-in. Grundy was later indicted in relation to this case, as well.

{¶23} Trooper Skaggs spoke with the owner of Fox's Auto; appellant's brother Robert Dotson; and a few other individuals. The police eventually recovered the stolen ATV from a third party. Trooper Skaggs also testified that appellant had called him, menacing and agitated that Trooper Skaggs was "harassing" appellant's friends regarding the investigation. Recordings of these phone calls were played for the jury. Appellant also followed Trooper Skaggs in his vehicle and confronted him while stopped at a traffic light.

{¶24} Candace and Deborah Dotson, appellant's mother, both testified on appellant's behalf. Both stated they were at the hospital with appellant the night of March 11, 2014, into the early morning of March 12, 2014. Both testified that Stephanie and Grundy were in the hospital room when they arrived, but Stephanie left a little while later. Brown was not there. Both acknowledged that appellant returned to Fox's Auto after he received medical treatment for the metal shard in his eye. They both testified, however, that when he left Fox's Auto, appellant went home to the residence he shared with Candace and did not leave during the night. Both testified that appellant's eye was swollen, he was wearing a patch, he was medicated for pain, and he needed assistance

8

walking.  Candace also testified that she thought Stephanie was Brown's girlfriend, not appellant's girlfriend.

{¶25}  The defense also called Catherine Reble, R.N., who testified that appellant reported to the emergency room on March 11, 2014, at 11:39 p.m.; she was assigned as his nurse at 11:49 p.m.  After the procedure was performed on appellant's eye, an eye patch was applied at 1:06 a.m.  She affirmed that appellant's medical chart does not indicate his eye was swollen shut or swelling, and his pain level was a "4" on a 0 to 10 scale.  Nurse Reble testified appellant was given a dose of narcotic pain medication and discharged at 1:25 a.m. on March 12, 2014.  He was ambulatory at the time of discharge.

{¶26}  Mr. Kalogeras filed a theft report through his insurance company and paid deductibles for each vehicle.  The vehicles were never returned to Mr. Kalogeras, and the deductibles were never refunded.  A letter from Mr. Kalogeras' insurance company was offered into evidence, outlining the deductible for each vehicle.  The letter provides, in part:

> Following up to our conversation, I am outlining the claims that were paid from the incident that occurred when your business was broken into.  I have also noted the claims which were under the deductible, but your business still sustained a loss.  This claim was for:
>
> Theft of five vehicles, theft of three sets of keys, and repairs to two vandalized vehicles.  For each vehicle, your business had a deductible of $1,000.00.

{¶27}  The jury was instructed, inter alia, on complicity, and appellant was found guilty of all charges on August 17, 2017.

{¶28}  The trial court held a sentencing hearing on September 18, 2017.  Both defense counsel and the prosecution submitted sentencing memoranda addressing the issue of merger.  Appellant requested merger of the seven theft offenses and merger of

9

the two breaking and entering offenses, with an aggregate prison sentence of one year. The prosecution argued none of the charges should merge and requested a prison sentence of 126 months.

{¶29} Appellant was sentenced to a prison term of 18 months on Counts 1, 2, 3, 4, and 5; and 12 months on Counts 6, 7, 8, and 9. The trial court's entry states that Counts 1 and 2 merge for sentencing purposes; Counts 3, 4, 5, 6, and 7 merge for sentencing purposes; and Counts 8 and 9 do not merge with each other or any other count. The trial court ordered the merged sentence on Counts 1 and 2 to run consecutive to the merged sentence on Counts 3, 4, 5, 6, and 7, which is to run consecutive to the sentence on Count 8, which is to run consecutive to the sentence on Count 9. Appellant was therefore ordered to serve a total term of imprisonment of 60 months. He was also ordered to pay restitution in the amount of $6,000.00 and the costs of prosecution.

{¶30} The entry on sentence was journalized on October 6, 2017, from which both appellant and the state of Ohio have appealed. Appellant raises five assignments of error for our review:

> [1.] Appellant's convictions are not supported by sufficient evidence.
>
> [2.] Appellant's convictions are against the manifest weight of the evidence.
>
> [3.] The trial court erred and abused its discretion by permitting a police officer to generally testify that other witnesses, ones that were not present at trial, corroborated the officer's findings regarding appellant.
>
> [4.] The trial court erred and abused its discretion by failing to include Stephanie in its jury instruction concerning accomplices.
>
> [5.] The trial court erred, as a matter of law, by failing to merge all of the Grand Theft counts with one another and the two Breaking and Entering counts with one another.

10

The State raises one cross-assignment of error:

> The trial court erred in merging Counts 1 and 2, and Counts 3, 4, 5, 6, and 7 for sentencing purposes.

{¶31} In order to prove appellant committed Grand Theft of a Motor Vehicle (Counts 1-5), the State had to prove beyond a reasonable doubt that appellant, on or about March 12, 2014, with purpose to deprive the owner of property, knowingly obtained or exerted control over the property without the consent of the owner or person authorized to give consent, and the property stolen was a motor vehicle in Trumbull County, Ohio. R.C. 2913.02(A)(1) & (B)(5). The vehicles associated with these counts are two side-by-side vehicles, two motorcycles, and an ATV with a plow.

{¶32} In order to prove appellant committed Attempted Grand Theft of a Motor Vehicle (Counts 6-7), the State had to prove beyond a reasonable doubt that appellant, on or about March 12, 2014, with purpose to deprive the owner of property or services, engaged in conduct that if successful would have resulted in the offense of Grand Theft of a Motor Vehicle, in Trumbull County, Ohio. *See* R.C. 2923.02(A). The vehicles associated with these counts are two motorcycles.

{¶33} In order to prove appellant committed Breaking and Entering (Counts 8-9), the State had to prove beyond a reasonable doubt that appellant, on or about March 12, 2014, by force, stealth, or deception, trespassed in an unoccupied structure with purpose to commit therein any theft offense in Trumbull County, Ohio. R.C. 2911.13(A).

{¶34} Under his first assignment of error, appellant argues his convictions are not supported by sufficient evidence because the only evidence of his involvement in the

11

crimes was the uncorroborated testimony of alleged accomplices: Jonathan Brown and Stephanie Collins.

**{¶35}** When reviewing whether sufficient evidence was presented to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307 (1979). Thus, a claim of insufficient evidence invokes a question of due process, the resolution of which does not allow for a weighing of the evidence. *State v. Habo*, 11th Dist. Portage No. 2012-P-0056, 2013-Ohio-2142, ¶14 (citation omitted).

**{¶36}** First, appellant's argument appears to be based on outdated law. He relies on *State v. Maddox*, 8th Dist. Cuyahoga Nos. 44600 & 44608, 1982 WL 2521 (Nov. 4, 1982) for the proposition that no person shall be convicted of any offense solely on the uncorroborated testimony of an accomplice. *Id.* at *9. *Maddox*, however, relies on former R.C. 2923.03(D), which has since been amended. The former statutory provision provided: "No person shall be convicted of complicity under this section solely upon the testimony of an accomplice, unsupported by other evidence." The statute no longer prohibits a conviction in such circumstances; rather, the court is required to provide the jury with a cautionary instruction: The current statutory provision provides:

> If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:
>
> 'The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the

12

admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.'

R.C. 2923.03(D). Thus, the statute no longer requires that accomplice testimony must be corroborated in order to secure a conviction. The testimony of an accomplice raises issues of credibility, which is a matter entrusted to the jury. "On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, *if believed*, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring) (emphasis added).

{¶37} In this case, the trial court properly instructed the jury in accord with the mandate of the statute regarding the testimony of Jonathan Brown.

{¶38} Appellant's first assignment of error is without merit.

{¶39} Underlying appellant's first assignment of error is the assertion that Stephanie Collins was an accomplice in this matter. In his fourth assignment of error, appellant also maintains that the trial court erred in failing to include Stephanie in its jury instruction concerning accomplices.

{¶40} Construing former R.C. 2923.03(D), the Supreme Court of Ohio determined that, "at the very least, an 'accomplice' must be a person indicted for the crime of complicity." *State v. Wickline*, 50 Ohio St.3d 114, 118 (1990). After R.C. 2923.03(D) was amended to the current version, the Supreme Court of Ohio maintained "there is no evidence that the General Assembly intended to change the meaning of the term 'accomplice.'" *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶132.

13

{¶41}  Stephanie was never indicted on any charges in connection with the break-in at Johnny K's.  Nevertheless, appellant maintains Stephanie is an "unindicted accomplice," and that the jury should have been instructed to view her testimony with the same level of suspicion as an indicted accomplice.

{¶42}  We note some Ohio courts have held that an accomplice instruction may be required when a witness has not been indicted if that witness received favorable treatment in return for his or her testimony.  *See State v. Taylor*, 9th Dist. Summit No. 27273, 2015-Ohio-403, ¶12-18; *State v. Lewis*, 4th Dist. Ross No. 14CA3467, 2015-Ohio-4303, ¶13-20.  That exception to the Supreme Court's definition of "accomplice" does not apply here, however, as no evidence was presented that Stephanie was offered or received any favorable treatment in return for testifying on behalf of the prosecution.  Thus, the trial court did not err in failing to include Stephanie in its jury instruction concerning accomplices.

{¶43}  Appellant's fourth assignment of error is without merit.

{¶44}  Under his second assignment of error, appellant argues his convictions are against the manifest weight of the evidence, primarily because of inconsistent testimony regarding the timeline of events during the evening of March 11 and the early morning hours of March 12, 2014.  Appellant maintains that "the facts developed at trial clearly show that the timeline established by the [State's] witnesses was simply impossible."

{¶45}  To determine whether a verdict is against the manifest weight of the evidence, a reviewing court must consider the weight of the evidence, including the credibility of the witnesses and all reasonable inferences, to determine whether the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the

14

conviction must be reversed and a new trial ordered.'" *Thompkins*, *supra*, at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A judgment of a trial court should be reversed as being against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*, *supra*, at 175.

{¶46} Although the witnesses for the prosecution and the defense provided inconsistent and, at times, contradictory testimony regarding the timeline of the night and morning in question, the jury was in the best position to view the witnesses and evaluate their credibility. If certain testimony was believed, it was not impossible for appellant to have committed the crimes of which he was charged. Upon review of the evidence outlined above, we do not conclude that the jury lost its way or created a manifest miscarriage of justice by finding appellant guilty of all charges. Appellant's convictions are not against the manifest weight of the evidence.

{¶47} Appellant's second assignment of error is without merit.

{¶48} Under his third assignment of error, appellant argues the trial court erred by permitting Trooper Skaggs to generally testify over objection that other witnesses, ones not present at trial, corroborated the officer's findings regarding appellant and led him to recover vehicles. Appellant maintains the specific line of questioning indirectly violated the spirit of the hearsay rules.

{¶49} A trial court's ruling on the admission of evidence is generally reviewed for an abuse of discretion. The trial court does not, however, have discretion to admit hearsay evidence unless the law provides an exception for its admission. A trial court's ruling on a hearsay objection is therefore reviewed de novo. *See Jack F. Neff Sand &*

15

*Gravel, Inc. v. Great Lakes Crushing, Ltd.*, 11th Dist. Lake No. 2012-L-145, 2014-Ohio-2875, ¶23.

{¶50} We provide the following excerpts from the transcript as an example of the offensive line of questioning. The prosecutor first questions Trooper Skaggs about a conversation he had with Matthew Mobley, who did not testify at trial:

Q: Did you ask him if he knew that Bryan Dotson and Jonathan Brown had broken into Johnny K's and stole vehicles from there?

[DEFENSE COUNSEL]: Objection.
THE COURT: If you're saying did he ask them that?
[PROSECUTOR]: That's my question.
THE COURT: Then it's overruled.

Q: (By [Prosecutor]): You can answer.

A: Can you ask that question again?

Q: Did you ask him if he knew that Bryan Dotson and Jonathan Brown had broken into Johnny K's and had stolen vehicles?

A: Yes, sir, I did.

Q: Did you ask him if he had seen four wheelers at Fox's Automotive shop?

A: Yes, sir, I did.

Q: Did you ask him if Dotson and Brown had gotten keys for the four wheelers from Johnny K's?

A: Yes, sir, I did.

The prosecutor later questions Trooper Skaggs about a conversation he had with the owner of Fox's Auto, who also did not testify at trial:

Q: Okay. And when you met with him, did you tell him that you wanted to talk to him about stolen property that he had received from Bryan Dotson and, in particular, property from Johnny K's?

A: Yes, sir, I did.

16

Q: And did you ask him if had [sic] gotten any property from Bryan Dotson?

A: Yes, sir.

Q: And when you asked him if he had gotten any property from Bryan Dotson, did you ask him if he had sold a side by side Polaris ATC that he had gotten from Bryan Dotson?

A: Yes, sir.

{¶51} Defense counsel raised an objection to this line of questioning, arguing it was hearsay. The trial court correctly concluded it was not hearsay, but it was leading. Defense counsel then entered a continuing objection as to the leading nature of the questions. After that, several more leading questions were advanced. Upon review, we conclude that the line of questioning was unnecessarily leading for a direct examination of a non-hostile witness, while also at times assuming facts not in evidence. We do not conclude, however, that it violated the spirit of the hearsay rules. Regardless, any error in permitting the prosecutor to question the trooper in this manner was harmless. The testimony ultimately was elicited primarily for the purpose of establishing how the investigators came to recover the stolen vehicles. Even without this testimony, there was substantial other evidence to support appellant's convictions. Therefore, excluding this testimony would not have affected the result of the trial.

{¶52} Appellant's third assignment of error is without merit.

{¶53} Finally, we jointly consider appellant's fifth assignment of error and the State's sole assignment of error.

{¶54} Appellant asserts the trial court should have merged all seven counts of Grand Theft of a Motor Vehicle (Counts 1, 2, 3, 4, 5, 6, 7) and both counts of Breaking

17

and Entering (Counts 8 and 9) for purposes of sentencing, which would have resulted in one fourth-degree felony conviction and one fifth-degree felony conviction. The State, on the other hand, asserts the trial court erred in merging Counts 1 and 2 and in merging Counts 3, 4, 5, 6, and 7 for purposes of sentencing.

{¶55} Merger of multiple counts for purposes of sentencing is governed by R.C. 2941.25:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

"[T]he statute incorporates the constitutional protections against double jeopardy. These protections generally forbid successive prosecutions and multiple punishments for the same offense." *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶7.

{¶56} The Supreme Court of Ohio has clarified the applicable standard when determining whether offenses merge for sentencing purposes:

> Rather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation.
>
> As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were

18

they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

* * * 'We recognize that this analysis may be sometimes difficult to perform and may result in varying results for the same set of offenses in different cases. But different results are permissible, given that the statute instructs courts to examine a defendant's conduct—an inherently subjective determination.'

*State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶30-32, quoting *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, ¶52. The Court additionally explained that "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶23.

{¶57} Appellate courts review a trial court's R.C. 2941.25 determination de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶1.

{¶58} With regard to Counts 8 and 9, Breaking and Entering in violation of R.C. 2911.13(A), we agree with the trial court that merger is not appropriate. R.C. 2911.13(A) provides that "[n]o person by force, stealth, or deception, shall trespass in an unoccupied structure, with purpose to commit therein any theft offense, as defined in section 2913.01 of the Revised Code, or any felony." Appellant first trespassed into Johnny K's by force (Count 8); later that evening, after taking certain vehicles to the residence, appellant chose to return to Johnny K's and trespass again, this time by stealth or deception (Count 9), took three more vehicles, and attempted to take two others. Accordingly, the two Breaking and Entering offenses were committed separately, and the trial court did not err in failing to merge Counts 8 and 9 for purposes of sentencing. Appellant's argument in this regard is not well taken. *See State v. Vanausdal*, 3d Dist. Shelby No. 17-16-06, 2016-

Ohio-7735, ¶14 (citations omitted) ("Whether offenses are committed separately often hinges on whether there is a temporal or spatial separateness in the offenses. However, even a 'slight' temporal separation of the offenses can establish separate offenses.").

{¶59} With regard to the merger of Counts 1 and 2 and the merger of Counts 3 through 7, the trial court indicated it decided to merge the counts for the contents that were involved with each separate breaking and entering: Counts 1 and 2 correspond to the vehicles that were taken during the breaking and entering that corresponds with Count 8; Counts 3 through 7 correspond to the vehicles that were taken (or attempted to be taken) during the breaking and entering that corresponds with Count 9.

{¶60} Appellant relies on the Second Appellate District's opinion in *State v. Skapik*, 2d Dist. Champaign No. 2015-CA-5, 2015-Ohio-4404, for the proposition that the trial court should have merged all seven counts. In *Skapik*, the defendant stole two firearms, a bulletproof vest, and other items from an off-duty deputy sheriff's vehicle. *Id.* at ¶12. The defendant was convicted of three counts of theft. *Id.* On appeal, the defendant argued the three counts should have merged because "he stole everything at one time from one location in a single act committed against a single victim." *Id.* The *Skapik* Court agreed with the defendant and reversed for resentencing. *Id.* at ¶25. The Court reasoned that, in accordance with *Ruff*, the defendant's "conduct constituted a single offense committed with a single animus resulting in a single harm against a single victim." *Id.* at ¶13.

{¶61} Here, contrary to *Skapik*, the State proved that each of appellant's grand theft offenses resulted in separate and identifiable harm. Among other things, evidence established the victim had to pay a separate insurance deductible for each vehicle. Thus,

they are dissimilar in import. *Compare State v. Wallace*, 11th Dist. Ashtabula No. 2016-A-0008, 2016-Ohio-8515, ¶101-102 (where three theft offenses for receiving three separate cash payments amounted to separate and identifiable harm). Additionally, each offense was committed with a separate animus or motivation: each stolen vehicle had to be removed from the building one at a time, and with regard to vehicles for which they did not have keys, the ignitions had to be individually "hotwired."

{¶62} Thus, we conclude the trial court erred in merging Counts 1 and 2 and Counts 3 through 7, and this matter must be reversed for resentencing.

{¶63} We further note a fundamental procedural error regarding the merger that took place below, to wit: even if it was appropriate for the trial court to merge these counts, there was no indication into which counts they merged, as the State was afforded no opportunity to make an election in this regard.

{¶64} "When the trial court determines multiple counts merge, the defendant can be convicted of only one of the merged counts. At that point, the state must make an election on which count it would like the court to proceed with sentencing." *State v. Jameson*, 11th Dist. Ashtabula No. 2014-A-0069, 2015-Ohio-4634, ¶20. Here, however, the State did not make an election, and the trial court convicted appellant of each individual count rather than on the two counts into which the others were to have merged. In other words, it is as if the trial court ordered concurrent sentences on each count instead of merging the counts for purposes of sentencing. This is most apparent when considering that the trial court ordered different lengths of prison terms for some of the counts that were "merged."

{¶65} The trial court's entry, in pertinent part, reads as follows:

21

It is therefore ordered that the defendant serve a prison term of:

1) Eighteen (18) months on Counts 1, 2, 3, 4, and 5, and twelve (12) months on Count 6, 7, 8, and 9; and

2) Counts 1 and 2 merge for sentencing purposes, and Counts 3, 4, 5, 6, and 7, merge for sentencing purpose, but will run consecutive to the sentence imposed for Counts 1 and 2, and

3) The sentence imposed in Count 8 will run consecutive to the sentence imposed for Counts 3, 4, 5, 6, and 7; and

4) The sentence imposed in Count 9 will run consecutive to the sentence imposed for Count 8

5) The total term of incarceration shall be sixty (60) months.

**{¶66}** Referring to the sentencing transcript provides no clarity in this regard, and actually confuses the issue as to which counts were intended to be "merged":

> [THE COURT]: So that Count 1 and 2 will be 18 on each, and they will run consecutive to Count 8, for a term of 30 months. Counts 3, 4, and 5 will be 18 months. Count 6 and 7 will be 12 months, those will be concurrent to each other and consecutive to Count 9 which is the second B&E, for a total of 30 months. And those sentences will run consecutive to each other, for a total sentence of 60 months.
>
> * * *
>
> [DEFENSE COUNSEL]: Your Honor, was there any merger in there, just for the record?
>
> [THE COURT]: What I did is I merged those sentences together. That's why when you merged all those together it makes 18 months for the 3, 4, 5, 6 and 7 and consecutive to the B&E. And the 1 and 2, 18 months, they merge, but run consecutive to the first B&E which is Count 8. That's how I got 60 months. In other words, the contents merged separately based on the Court's finding that they are clearly two separate attempts by time and space.

**{¶67}** Based on our de novo conclusion, however, that *none* of the grand theft counts should have merged for sentencing purposes, this procedural error is, in effect, harmless.

22

{¶68} Appellant's fifth assignment of error is not well taken.

{¶69} The State's sole assignment of error has merit, and this matter will be remanded for resentencing.

{¶70} We further note a clerical error in the entry on sentence. The entry provides, in part, that appellant was found guilty "as to the Indictment, Counts 1-7: Grand Theft of Motor Vehicle (F4) (ORC 2913.02(A)(1)&(B)(5)); and Counts 8 & 9: Breaking & Entering (F5) (ORC 2911.13(A)&(C))." However, the jury found appellant guilty of, and appellant was sentenced on, an amended indictment, to wit: Counts 1-5, Grand Theft of Motor Vehicle (F4), in violation of R.C. 2913.02(A)(1) & (B)(5); *Counts 6-7, Attempted Grand Theft of Motor Vehicle (F5), in violation of R.C. 2913.02(A)(1) & (B)(5) and R.C. 2923.02(A)*; and Counts 8-9, Breaking & Entering (F5), in violation of R.C. 2911.13(A) & (C). On remand, the trial court shall also correct the sentencing entry in this regard.

{¶71} The judgment of the Trumbull County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded for resentencing consistent with this opinion.


CYNTHIA WESTCOTT RICE, J., concurs,

THOMAS R. WRIGHT, P.J., concurs in judgment only.