[Cite as *State v. Perryman*, 2019-Ohio-4616.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                             Court of Appeals No. L-18-1031

       Appellee                                       Trial Court No. CR0201702541

v.

Edward Damon Perryman                      **DECISION AND JUDGMENT**

       Appellant                                     Decided:  November 8, 2019

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lauren Carpenter, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**MAYLE, P.J.**

{¶ 1} Defendant-appellant, Edward Damon Perryman, appeals the January 17, 2018 judgment of the Lucas County Court of Common Pleas, convicting him of improperly discharging a firearm at or into a habitation, and an accompanying specification for firing the weapon from a motor vehicle.  For the reasons that follow, we affirm.

## I.  Background

{¶ 2} Edward Perryman and S.E. were involved in a romantic relationship.  On August 17, 2017, following separate arguments with S.E., her adult daughter, J.E., and her teenaged daughters, S.R. and M.R., Perryman pulled into an alley along the side of S.E.'s house and fired shots into her home through the passenger-side window of his white Toyota Camry.  S.E., J.E., and two young children were in the home at the time of the shooting.

{¶ 3} According to the evidence presented by the state, Perryman was at S.E.'s home in the late afternoon.  At some point, Perryman and S.E. left and went to a park with Perryman's puppy.  While at the park, Perryman was behaving irrationally and acting abusively toward the puppy, which embarrassed S.E.  She insisted on returning home.

{¶ 4} Upon returning to S.E.'s house, Perryman argued with S.E.'s daughter, J.E.  J.E. ordered Perryman to leave, and he drove off in his white Toyota.  Shortly thereafter, J.E. was preparing to give her toddler a bath and S.E. was talking on the phone with a friend when they heard loud music coming from the alley along the side of the house.  S.E., who was sitting at the table, stood up, saw through the window that Perryman was in the passenger seat of his Toyota, then sat back down.  J.E. looked out the window.  She too saw Perryman in the passenger seat of his car.  She then saw Perryman point a gun through the window of the vehicle and saw three flashes of gunfire.  She grabbed her son and ran upstairs.

2.

{¶ 5} J.E. called 9-1-1 to report the shooting. She identified Perryman as the gunman and described his car. Two Toledo Police officers reported to the scene. The officers found three shell casings in the alley. They summoned the detective on duty, who also reported to the scene. After a cursory look around the first floor and the exterior of the home, the officers and detective found no evidence that any bullets had penetrated the house, and they theorized that Perryman had fired shots into the air. Notably, they did not inspect the second floor. They advised the women to call if they found evidence that the gun had been fired into the house.

{¶ 6} Not long after the officers and the detective left, J.E. asked her teenaged sister, M.R., to give her son a bath. M.R. and her 16-year-old sister, S.R., also lived in the home, but were not there at the time of the shooting. They had walked to a neighborhood carryout where they, too, encountered Perryman in his vehicle. Perryman made disparaging comments to them, and the sisters told him to go away. Perryman said "watch this, watch this," and took off in his car. On their way home from the carryout, S.E. called to tell them about the shooting and told them to be careful.

{¶ 7} When M.R. went into the second-floor bathroom to prepare the bath for her nephew, she saw that there was a bullet hole in the bath tub. The bullet had traveled through the doorknob, shattering it, and entered a wall in the hallway. The women called the police to report what they had found. Two different patrol officers arrived on the scene and the detective returned. Upon further inspection of the home, it was discovered that a second bullet had penetrated the wall in S.R.'s bedroom, pierced an electrical

3.

socket, and went through the wall of the closet into M.R.'s room. The officers examined the exterior of the house and found two places where bullets had entered the home.

{¶ 8} Perryman was indicted on September 5, 2017, on one count of improperly discharging a firearm at or into a habitation, a violation of R.C. 2923.161(A)(1) and (C), a second-degree felony, and a specification under R.C. 2941.146(A), (B), and (D), for discharging the firearm from a motor vehicle. Following a jury trial, Perryman was convicted and sentenced to a three-year prison term for the primary offense and a mandatory five-year term prison for the specification.

{¶ 9} Perryman appealed and assigns the following errors for our review:

I.

The trial court erred in denying Appellant's Crim.R. 29 motion.

II.

The jury's verdict was against the manifest weight of the evidence presented at trial.

## II. Law and Analysis

{¶ 10} Under R.C. 2923.161(A)(1), "[n]o person, without privilege to do so, shall knowingly * * * [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual * * *." Where the indictment alleges—and it is proven—that this offense was committed by discharging the firearm from a motor vehicle, a mandatory five-year prison term must be imposed. R.C. 2941.146(A).

4.

{¶ 11} In his first assignment of error, Perryman argues that the state failed to offer credible evidence that he fired shots into the victim's residence or that he fired those shots from inside a vehicle. In his second assignment of error, he argues that his convictions were against the manifest weight of the evidence.

## A. Crim.R. 29

{¶ 12} Perryman maintains that significant discrepancies render J.E. and S.E.'s testimony not credible and insufficient to support his conviction. Specifically, he claims that S.E. and J.E.'s testimony differed as to where he was in the moments before the shots were fired; J.E. could not describe him when she called 9-1-1, yet at trial, she offered precise details describing his clothing; J.E. could not describe who was with Perryman in his car; J.E. did not state that Perryman fired the weapon from inside his car—only that he was in a white Toyota; S.E. testified to seeing him outside the car; and J.E. failed to tell investigating officers that she witnessed three flashes of gunfire. Perryman insists that J.E. and S.E.'s "conflicting" statements call into question J.E.'s credibility.

{¶ 13} A motion for acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 14} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a

5.

challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

{¶ 15} Here, the state presented the testimony of a number of witnesses, including J.E., S.E., and the responding officers. J.E. testified that after Perryman and her mother returned from the park, Perryman was "talking to us all crazy and everything." She told him to leave. Perryman told J.E. that he would "go in [his] trunk and air this bitch out and stuff," which J.E. interpreted to mean that he was going to get a gun out of his trunk and "shoot the house up." J.E. told Perryman that if he did not leave, she would call the police. Perryman got in his car and drove off.

{¶ 16} J.E. testified that she went upstairs to run the bathwater to give her son a bath. She turned off the water and went back downstairs. Her mom received a phone call and J.E. sat on the floor. A few minutes later, J.E. heard music and told her mom that Perryman was outside "making all this music" and "he's coming back in after I just told him he's not allowed over here." She looked outside and Perryman was in the alley. She saw him in the passenger seat of the car holding a gun out the window, and he started

6.

shooting.  She grabbed her son and went upstairs.  She told her mom that Perryman was shooting at the house.

{¶ 17} Despite the fact that it was getting dark outside, J.E. made clear that she saw Perryman's face and identified him as the shooter.  At trial, she described that he was wearing a white, striped muscle shirt, black shorts, and "Forces" on his feet when she saw him earlier in the day, but she could not see his shorts and shoes when he was in the vehicle and could not see who was driving.  J.E. recalled speaking to the female officer who responded to the incident, but she did not recall telling the officer that she observed three flashes.

{¶ 18} S.E. testified that she and Perryman had been at the park and Perryman was acting abusively toward his puppy.  This embarrassed her and she insisted on going home.  S.E. said that Perryman was "talking crazy" to her.  When they got to her home, J.E. and Perryman argued.  Perryman was angry and left.  J.E. was at the window when they heard music playing.  J.E. said "here comes your crazy friend."  S.E., who was sitting at the table talking on the phone, raised herself up, peeked out the window, and saw Perryman pulling up in the alley in his Toyota Camry.  She was waiting to see if Perryman was going to honk or knock on the door, but he did not.  The volume of the music decreased; shortly thereafter, S.E. heard shots being fired.  J.E. moved away from the window, grabbed her son, and ran upstairs.  S.E. followed her up the steps.  S.E. estimated that it was about five minutes between the time that she saw Perryman's car pull into the alley and when she heard the shots fired.  S.E. did not see Perryman shoot,

7.

but she knows it was him because she saw him from the window and J.E. told her that Perryman was shooting.

{¶ 19} Toledo Police Officer Brooke Janowiecki, the first patrolman on the scene, testified that she and her partner arrived at S.E.'s home at 9:38 p.m. J.E. was "extremely distraught, upset and kind of frantic." She told Officer Janowiecki that Perryman had been there and she argued with him. Perryman left and J.E. watched out the window to make sure he was leaving. She saw Perryman standing next to a white Toyota sedan and saw flashes of light. Officer Janowiecki testified that she was not given a description of what Perryman was wearing or his physical attributes.

{¶ 20} Toledo Police Officer George Stauch testified that he went to the home after the family discovered the bullet holes. He said that J.E. told him that she was just about to take her son upstairs for a bath when she looked out the front window and saw a white car. She told him that Perryman was inside the vehicle—in the passenger seat—with the gun out the window. She saw muzzle flashes and ran for cover with her child.

{¶ 21} Bullet holes in the siding, the tub, the walls, the door knob, and the electrical socket substantiated J.E.'s claims that shots were fired into the home. Despite Perryman's assertions to the contrary, J.E. was clear at trial that she saw Perryman fire shots toward the house from inside his vehicle, and Officer Stauch testified that J.E. told him the same thing on the night of the shooting. While Officer Janowiecki testified that J.E. told her that Perryman was standing outside the white Toyota, we conclude that the state presented sufficient credible evidence to support a conviction of both the primary

8.

offense—improper discharge of a firearm at or into a habitation—and the accompanying specification—firing the weapon from a motor vehicle.

{¶ 22} Accordingly, we find Perryman's first assignment of error not well-taken.

## B. Manifest Weight

{¶ 23} In his second assignment of error, Perryman argues that "the jury viewed the witnesses against him as credible despite their conflicting testimony as to where exactly he was in relation to his vehicle when the shots were alleged to have been fired by him." He argues that "[w]hether [he] was present, given the conflicts in the timeline, or was in the vehicle or next to the vehicle is an open question and remains unclear." Perryman also argues that the state presented "no forensic evidence pertaining to any scientific investigation of [his] vehicle." He insists that given its theory that he fired shots from his vehicle, the state could have performed tests to determine if there was gunshot residue in the car or on any of his clothing.

{¶ 24} Perryman also argues that in the 9-1-1 call, J.E. identified him, but offered no physical description despite doing so at trial. He points out that S.E. did not see him shooting and remained in contact with him up until the time of his arrest despite the allegations that he had shot into her home while she, her daughter, and her grandchildren were inside. Perryman insists that the jury lost its way and did not fully consider the evidence due to their "unsupported perception that [Perryman] was abusive to S.E. and her family." He maintains that the verdict was against the manifest weight of the evidence.

9.

{¶ 25} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 26} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 27} Here, it is true that Officer Janowiecki testified that J.E. told her that Perryman was standing next to the white Toyota when she saw flashes of light. It is also true that S.E. did not see him fire the shots. Nevertheless, J.E. testified that she saw

Perryman fire the shots and she saw him do so from the passenger seat of the car. Officer Stauch testified that this was what J.E. told him on the night of the incident. It was for the jury to determine which witnesses' account to believe.

{¶ 28} Additionally, we acknowledge that at trial, J.E. specifically described Perryman's clothing, but did not tell the 9-1-1 operator what he was wearing. We also acknowledge that the witnesses differed in estimating the amount of time that elapsed between (1) the time Perryman left and returned, and (2) the time Perryman returned and the time he started shooting. But we find that these were all credibility issues for the trier of fact. *See, e.g., State v. Manning*, 8th Dist. Cuyahoga No. 90326, 2008-Ohio-3801, ¶ 13 (credibility issue presented where at time of event, witness could not recall clothing she wore, but at trial, vividly recalled that she wore red outfit); *State v. Dotson*, 11th Dist. Trumbull No. 2017-T-0103, 2019-Ohio-2393, ¶ 46 (witnesses' inconsistent timelines presented credibility issues); *State v. Tingley*, 6th Dist. Ottawa No. OT-16-003, 2016-Ohio-8528, ¶ 23 (discrepancies in witnesses' testimony and timelines did not render victim's testimony not credible).

{¶ 29} Finally, Perryman points out that S.E. continued to spend time with him, and was, in fact, with him when he was ultimately arrested. He also criticizes the state's failure to test for gunshot residue in the car or on his clothing. But S.E. was cross-examined about her continued relationship with Perryman. She explained that she continued to see Perryman because she wanted to avoid conflict until he was arrested.

11.

The jury was free to consider S.E.'s behavior in deciding whose version of events to believe.

{¶ 30} As to the state's failure to test for gunshot residue, the absence of forensic evidence did not require the jury to return a not-guilty verdict, especially where an eyewitness saw Perryman fire the weapon and identified him. *See, e.g., State v. Hill*, 8th Dist. Cuyahoga No. 99819, 2014-Ohio-387, ¶ 34 ("[T]he absence of a weapon or forensic evidence tying [defendant] to the shooting [did not] warrant overturning [his] convictions, where * * * credible eyewitness testimony identified [him] as one of the shooters."); *State v. Jordan*, 10th Dist. Franklin No. 04AP-827, 2005-Ohio-3790, ¶ 14 ("[E]ven where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable juror could find the eyewitness testimony to be credible."); *State v. Jefferson*, 6th Dist. Lucas No. L-16-1182, 2017-Ohio-7272, ¶ 24-25) (rejecting manifest weight argument even though state failed to test for gunshot residue). Again, it was for the jury to decide whether J.E.'s testimony was credible.

{¶ 31} Here, the jury resolved evidentiary conflicts in favor of the state. We find no manifest miscarriage of justice requiring reversal, and we find Perryman's second assignment of error not well-taken.

### III. Conclusion

{¶ 32} The state presented credible evidence that Perryman shot at S.E.'s home from his vehicle. We find that there was sufficient evidence to support his conviction and his first assignment of error is not well-taken.

**{¶ 33}** We also find that any timeline discrepancies, differences in the witnesses' testimony concerning Perryman's position when he fired the gun, and inconsistencies in the information that the witnesses provided at the time of the incident versus at the time of trial presented credibility issues for the jury. Moreover, forensic evidence was not required to convict Perryman, particularly where an eyewitness identified him as the shooter. His conviction was not against the manifest weight of the evidence and his second assignment of error is not well-taken.

**{¶ 34}** We affirm the January 17, 2018 judgment of the Lucas County Court of Common Pleas. Perryman is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                    _____
                                                       JUDGE

Arlene Singer, J. _____

Christine E. Mayle, P.J. _____
CONCUR.                                                        JUDGE

_____
                                                      JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.